UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RANDY LANGHAMER, et al.,

                              Plaintiffs,

            -against-

RALPH C. JOHNSON, et al.,

                              Defendants.

Case No. 1:22-cv-05404 (JLR)

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

        Plaintiffs Randy Langhamer ("Randy"), Debra Langhamer ("Debra"), their children –
Craig Langhamer, Scott Langhamer, Keith Langhamer, and Marc Langhamer (together, the
"Langhamer Children") – acting as beneficiaries under the Uniform Gifts to Minors Act
("UGMA"), and Terri Weller ("Terri" and, collectively, "Plaintiffs") bring this action against
Defendants Ralph C. Johnson ("Johnson"), American Growth Funding II, LLC ("AGF II"),
Propellus, Inc. ("Propellus"), Propellus Financial Services, Inc. ("PFSI"), and AGF
Management II, LLC ("AGF Management" and, collectively, "Defendants"). *See generally*
ECF No. 61 ("Am. Compl."). Plaintiffs allege that Defendants, through a series of fraudulent
misrepresentations and omissions, violated Sections 10(b) and 20(a) of the Securities
Exchange Act of 1934 as amended ("Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), Securities
Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5,
and New York common law. *See id.* ¶¶ 246-368. Now before the Court is Defendants'
motion to dismiss Plaintiffs' claims. *See* ECF No. 70 ("Br."). Plaintiffs oppose that motion.
*See* ECF No. 76 ("Opp."). For the reasons set forth below, Defendants' motion to dismiss is
DENIED.

BACKGROUND[1]

## I.  Factual Background

The following facts are taken from the pleadings and are undisputed unless otherwise noted.  *See* Am. Compl.; Ans.

### A.  AGF II Investments

#### 1.  Overview

Defendant AGF II is a Nevada limited liability company that raised capital from investors to provide "high-risk, high interest loans to businesses that had difficulty obtaining credit from conventional lenders."  Am. Compl. ¶¶ 2, 72.  Defendant Johnson was the president and chief executive officer of AGF II.  *Id.* ¶ 39.  He was also the principal of AGF Management, the manager of ACF II, which was "responsible for all credit decisions, . . . and making all business decisions overseeing all operations of AGF II."  *Id.* ¶¶ 39, 46.

Beginning in March 2011, Johnson and AGF II sold units ("Units") to investors.  *Id.* ¶¶ 3, 74.  Among those investors were Randy and Debra Langhamer, who first purchased Units in July 2011 for themselves and then later as custodians of the Langhamer Children's UGMA accounts, and Terri Weller, who first purchased Units in June 2016.  *Id.* ¶¶ 26, 29-30, 37; *see id.* ¶ 86 (detailing dates of initial purchase).  In exchange for their investments, AGF II promised to pay them a one-percent return per month, totaling an annual return of twelve percent.  *See id.* ¶ 75.

---

[1] In support of their motion to dismiss, Defendants submitted an affidavit of Ralph C. Johnson (ECF No. 69 or "Johnson Aff."), with attached exhibits (ECF Nos. 69-1 through 69-3), and a memorandum of law in support (Br.).  In support of their opposition, Plaintiffs submitted an affidavit of Debra Langhamer (ECF No. 75 or "Langhamer Aff."), with attached exhibits (ECF Nos. 75-1 through 75-2), and a memorandum of law in opposition (Opp.).  Defendants then submitted a reply memorandum of law (ECF No. 77 or "Reply").

The private placement memoranda ("PPMs") that Johnson and AGF II issued in connection with the sale of these Units, *id.* ¶ 4, describe the details of this arrangement, *id.* ¶ 76. Every month, AGF II would pay each investor an amount equal to one percent of the investor's "unreturned capital contribution" ("Base Distribution") – that is, one percent of the investor's capital contributions, minus distributions made other than Base Distributions. *Id.* If funds were not available to pay Base Distributions for a given month, amounts otherwise payable to investors would accrue and be paid with the next monthly Base Distribution if funds were available. *Id.* Investors could opt, in lieu of these distributions, to reinvest those amounts with AGF II. *Id.* ¶ 77.

The PPMs also outlined a process by which investors could withdraw their money from AGF II. *See id.* Following a two-year lock-up period from the date that a given Unit was issued, investors could redeem that Unit for a price equal to their initial purchase price plus any earned but unpaid distributions (the "Redemption Price"). *Id.* Alternatively, investors could reinvest, or roll over, their investment in AGF II for another two-year lock-up period (the "Rollover Program"). *Id.*

From July 2011 through November 2020, Randy and Debra rolled over their investments every two years through the Rollover Program and reinvested their monthly distributions in AGF II. *Id.* ¶¶ 30, 79; *see id.* ¶ 86 (detailing dates of initial purchase, roll-over, and redemption for each of Plaintiffs' investments). Terri similarly rolled over her June 2016 investment in June 2018 and June 2020, and she reinvested her monthly distributions in AGF II. *Id.* ¶¶ 37, 79; *see id.* ¶ 86.

## 2.   Alleged Misrepresentations and Omissions

Plaintiffs allege that Defendants made materially false and misleading statements, on which Plaintiffs relied to purchase AGF II and participate in the Rollover Program. *Id.*

¶¶ 256, 286.  Plaintiffs assert that, had they known the truth of these statements, they would not have made those investments and reinvestments.  *Id.* ¶¶ 256, 289.  Because those statements are relevant to Defendants' motion to dismiss, the Court details them below.

### a)  SEC Enforcement Action

Plaintiffs allege that Defendants never disclosed in their communications with Plaintiffs any information about an enforcement action, brought in February 2016, in which the SEC charged Johnson and AGF II with "repeatedly lying to investors purchasing AFG II Units."  *Id.* ¶ 60; *see id.* ¶ 71.  AGF II and Johnson ultimately settled the enforcement action. *Id.* ¶ 64.  However, the SEC also charged in the same action Howard Allen ("Allen"), his employee Kerri Wasserman, and his broker-dealer company (together, the "PAA Defendants") – which AFG II and Johnson had hired to sell AGF II Units to investors, *id.* ¶¶ 52-55 – and they did not settle, *id.* ¶ 65.  In May 2019, a jury found that the PAA Defendants had made false and misleading statements in connection with the purchase and sale of AGF II Units.  *Id.* ¶ 66.  It also found that Allen and Wasserman had aided and abetted AGF II and Johnson in violating federal securities laws, including Section 10(b) of the Exchange Act.  *Id.* ¶¶ 66-67.

Plaintiffs allege that Defendants AGF II and Johnson, despite "continu[ing] to engage in much of the conduct for which they were charged by the SEC in 2016," did not disclose the existence of the enforcement action, their settlements with the SEC, the jury's verdict against the PAA Defendants, or the jury's implied finding that AGF II and Johnson were primary violators of federal securities laws.  *Id.* ¶ 70; *see id.* ¶ 71.

### b)  AGF II's Disclosure Practices

Plaintiffs also allege that Defendants "falsely led Plaintiffs . . . to believe that AGF II was the direct lender" for its advances and loans to small businesses.  *Id.* ¶ 84.  However,

AGF II and affiliated entities instead loaned their investor funds to AGF LLC ("AGF"), managed by Johnson, in exchange for promissory notes with no due dates for repayment.  *Id.* ¶ 80.  AGF, in turn, would use the money that it had borrowed to make short-term loans and advances (together, "Advances") to small businesses, which were supposed to repay, within one to three months, the principal plus interest, ranging from 24 to 36 percent per year.  *See id.* ¶¶ 80-81.  Because of this undisclosed structure, Plaintiffs allege that they "were not fully informed about how their investment dollars would be, and were being, used."  *Id.* ¶ 84.

Defendants also represented that AGF II would prepare annual financial statements and that these statements would be audited.  *Id.* ¶ 85.  However, Defendants often did not have those statements audited.  *See id.* ¶¶ 86-87 (noting that Defendants' representation in its initial 2011 PPM that AGF II's financial statements would continue to be audited per its "policy in the past" was false because AGF II, as a newly formed company, had never had its financial statements audited); *id.* ¶¶ 88-90 (noting that a similar representation in Defendants' 2012 PPM was false because "no audit had been conducted for AGF II until 2014" and the auditor identified in the PPM did not employ any certified public accountants); *id.* ¶¶ 91-92 (noting that representations in Defendants' 2014 and 2015 PPMs that AGF II would prepare annual financial statements were false because AGF II's next audited financial statement, completed in February 2018, covered only the 2015 fiscal year); *id.* ¶¶ 93-95 (noting as false Defendants' representation in its operating agreement, attached to various PPMs, that "AGF II's financial statements would be audited on a regular and timely basis following the end of each fiscal year"); *id.* ¶¶ 96-97 (noting as false Defendants' representation in an August 2020 email that their accountants were "in the midst of finalizing our year-end financial statements").  In any case, Defendants "never provided *any* financial statements, audited or

otherwise, to Plaintiffs." *Id.* ¶ 97.  Among the statements not received by Plaintiffs were AGF

II's 2015 financial statements, issued in February 2018.  *Id.* ¶¶ 92, 113, 124.  In connection

with those statements, auditors had noted that, of AGF II's "gross receivables" – which

totaled $16,898,290 as of December 31, 2015 – over 64%, or $10,896,783, was "doubtful" or

a "bad debt expense." *Id.* ¶ 108.  In other words, "much of the money invested by

Plaintiffs . . . was in serious jeopardy of being lost or materially reduced." *Id.*; *see id.* ¶ 113

(describing doubtful accounts as "not fully collectible").

Defendants also sent Plaintiffs allegedly false and misleading account statements.  *See*

*id.* ¶¶ 98-112.  Although these statements specified for each Plaintiff their "Principal

Investment," the interest accrued on that investment during the statement's given period, and

the total amount owed by AGF II, they did not disclose any information on the "performance

and status" of AGF's Advances or "the ability of AGF's borrowers to repay AGF." *Id.*

¶¶ 101-102.  However, Johnson, who communicated with AGF's borrowers, knew that many

of AGF's "underlying loans were underperforming, delinquent, and/or otherwise 90 days or

more behind in repayment." *Id.* ¶ 102; *see id.* ¶ 103.  None of the account statements

provided to Plaintiffs "disclosed the true current value of their investment," or "any

information regarding the likelihood that AGF II would be able to pay investors" the amounts

identified in the statements.  *Id.* ¶¶ 109-110.

### c)    *Viability of AGF's Underlying Loans*

Most of AGF II's "doubtful" accounts stemmed from loans made to three related

foreign entities: Royal Sovereign Group, Royal Sovereign Costino, and Minera Ranala S.A.C.

(the "Peruvian Mining Companies").  *Id.* ¶ 114.  Anthony Capazze ("Capazze"), a "senior

partner" of the Peruvian Mining Companies, was also a member of AGF II's Board of

Managers.  *Id.*  On August 13 and 27, 2019, Johnson asked Randy to pressure Capazze to

repay the Peruvian Mining Companies' outstanding loans.  *Id.* ¶¶ 124-125.  In early 2020, Randy called Capazze, who told him that the Peruvian Mining Companies had last made a payment to AGF four years ago and that they did not owe AGF any money.  *Id.* ¶ 126.  Randy learned from this call that Capazze "was a board member of [Johnson's] company."  *Id.* ¶ 127. However, he did not know "the true extent of the Peruvian Mining Companies' inability to repay the loans it received from AGF" or the "impact [that] the non-performance of those loans had on AGF II's financial condition."  *Id.* ¶ 128.

Rather than disclose the performance of the companies backing AGF II's payment obligations, Defendants led Plaintiffs to believe that the money owed under AGF's loans was fully collectible and, therefore, that Plaintiffs could expect a return on their investments.  *Id.* ¶ 10. However, to the extent that Defendants paid investors their monthly interest and redemptions, they did so in large part through contributions that AGF II received from new or existing investors.  *Id.*

### d)  Redemption Requests

Beginning in 2017, Plaintiffs sought to redeem their AGF II Units.  *Id.* ¶¶ 134-144. Johnson "lulled Plaintiffs into believing that their requests would be honored," or otherwise "gave excuses as to why such requests could not be made."  *Id.* ¶ 134; *see id.* ¶¶ 136-138, 143 (describing emails and a text message sent between April 2019 and June 2020, in which Randy stated that he wished to redeem his accounts, to which Johnson did not respond); *id.* ¶¶ 139-142 (describing Terri's written redemption request in May 2020, after which Johnson led Terri to believe that her request would be honored but he never redeemed Terri's account); *id.* ¶ 144 (noting that, in July 2020, Johnson answered one of Randy's redemption requests by saying that "[w]e're exploring tax options for this current year based on government changes, Covid, and what we can implement on our end").  Relying on Johnson's assurances that he

would honor their redemption requests, Plaintiffs agreed to roll over their investments in AGF II.  *Id.* ¶ 146.

Johnson also "dangled the prospect of new investor money coming into AGF II that would be available to honor the Langhamers' redemption requests."  *Id.* ¶ 153; *see id.* ¶ 154 (noting that Johnson falsely told Randy in March 2019 that AGF II was negotiating a "capital raise" that would be used to honor his redemption requests); *id.* ¶¶ 155-156 (describing a similar misrepresentation made in June 2019); *id.* ¶¶ 165-166 (describing similar misrepresentations made between September and November 2020); *id.* ¶¶ 167-168 (describing a similar misrepresentation made in November 2020).  Johnson assured Randy in October 2019 that AGF II would continue to pay interest on the Langhamer investments until they were redeemed.  *Id.* ¶ 157.  In January 2020, Johnson told Randy that a company was interested in purchasing AGF II's assets for $10 million.  *Id.* ¶ 158.  To convince Randy that the company's interest was genuine, Johnson fabricated an indication of interest, dated February 7, 2020, from a Canadian corporation.  *See id.* ¶¶ 159-162.  Nothing resulted from this purported transaction.  *Id.* ¶ 166.

### e)  Other Misrepresentations and Omissions

Johnson made other "materially false and misleading statements and omissions . . . intended to induce Plaintiffs to invest in AGF II."  *Id.* ¶ 169.  In connection with Terri's initial purchase of her AGF II Units in June 2016, Johnson represented that the loans made to small businesses were "triple secured and collateralized" and guaranteed by the owner or executive officer of the recipient company.  *Id.* ¶ 170.  Johnson made the same representation to Randy and Debra during a 2017 presentation at their home and again at other subsequent times.  *Id.* ¶¶ 171-172.  Johnson also represented that AGF II would not loan or advance money to any foreign entity and that all Advances would not exceed $250,000.  *Id.* ¶ 174.  At least with

respect to AGF's loans to the Peruvian Mining Companies, these representations were false. *Id.* ¶¶ 173-174.

In April 2020, Plaintiffs received partial copies of AGF II's 2018 and 2019 tax returns. *See id.* ¶¶ 236-238.  However, the copies provided only between 13 and 14 pages for each return, suggesting that Defendants had withheld most of the returns "to conceal financial information about AGF II, its performance and financial condition."  *Id.* ¶¶ 237-238.  On each return, Defendants had also redacted the tax preparer's name and contact information.  *Id.* ¶ 239.  When Plaintiffs and other AGF II investors asked why this information was withheld, Johnson replied that he could answer any tax questions and otherwise evaded their inquiry with "false and misleading reasons" for the redaction.  *Id.* ¶¶ 240-244.

## B.  The Exchange Offer

### 1.  Overview

In a monthly update sent on November 22, 2020, Defendants notified Plaintiffs and the other AGF II investors that they sent them a "Liquation and Exchange Agreement," which they described as "the best roadmap to recovery" from the effects of the coronavirus pandemic.  *Id.* ¶ 176.

The next day, Defendants sent AGF II investors a Notice of Exchange Offer (the "Exchange Offer").  *Id.* ¶ 186; *see* ECF No. 69-2 ("Notice").  Citing the "Covid-19 pandemic, and subsequent lockdowns and governmental regulations," Am. Compl. ¶ 186 (quoting Exchange Offer at 7), the Exchange Offer explained that AGF II faced financial difficulties amidst the "poor performance of [its] portfolio companies whose viability and ability to repay their outstanding obligations was in doubt," *id.*  As "part of [AGF II] Management's strategy," Johnson had created Propellus, a publicly traded company, to which it would transfer AGF II's assets.  *Id.* ¶ 187 (alteration in original) (quoting Exchange Offer at 3); *see id.* ¶ 201.  Like

AGF II, Propellus would "offer essential small businesses a variety of financing alternatives, including merchant cash advances and payroll advances . . . , short-term line of credit loans, and other types of loan products and cash flow financing."  *Id.* ¶ 190 (quoting Exchange Offer at 2).

Under the Exchange Offer, AGF II investors could opt in to the offering and exchange their pro-rata share of AGF II's assets for new shares in Propellus.  *Id.* ¶ 202.  Alternatively, investors could opt out and receive their pro-rata share of AGF II's assets in liquidation, which equaled AGF II's net assets as of November 30, 2020, plus the proceeds collected from those assets over the next 13 months, minus the costs incurred in collecting those proceeds.  *Id.* ¶ 203.  The Exchange Offer did not permit AGF II investors to redeem their AGF II Units.  *Id.* ¶ 206.

### 2.  Alleged Misrepresentations and Omissions

Plaintiffs allege that Defendants made materially false and misleading statements in their monthly update and the Exchange Offer, on which Plaintiffs relied when deciding to participate.  *Id.* ¶¶ 268, 302.  Plaintiffs assert that, had they known the truth of these statements, they would not have exchanged their Units in the offering.  *Id.* ¶¶ 273, 306.  In the monthly update, Defendants claimed that AGF II's collections had suffered in October and November because its "largest receivable[,] . . . the operator of a gold mining concern located in Peru," had paused operations because of COVID-19 and resulting "restrictions."  *Id.*  ¶ 177.  The update also justified AGF II's "liquidation and unwinding" as a "voluntary" transaction that would "best position the company and its investors for optimal recovery of assets" and provide "tax benefits."  *Id.* ¶ 183.

In the Exchange Offer, Defendants: (1) attributed AGF II's financial challenges solely to COVID-19 when most of AGF II's receivables, including those from Advances made to the

Peruvian Mining Companies, were impaired well before the beginning of the pandemic, *id.* ¶ 186; (2) stated that Propellus would "capitalize on the market dynamics created by the Covid-19 pandemic" when AGF II had failed to do so with substantially the same business model, *id.* ¶ 189 (quoting Exchange Offer at 3); (3) explained that investors would benefit from the chance "to provide capital to proven post Covid-19 essential businesses" and "build value in Propellus common shares by raising" outside capital, despite knowing or recklessly disregarding that "essential" COVID-19 businesses were performing well and did not need additional capital, and that investors would not buy into a company with a business model like that of AGF II, *id.* ¶ 192 (quoting Exchange Offer at 7); *see id.* ¶¶ 194-197; (4) noted that Propellus might hire Howard Allen to field investor calls and inquiries, but did not disclose that the SEC, through its enforcement action, had barred Allen from participating in any offering of a penny stock, which includes Propellus, *id.* ¶¶ 198-200; and (5) pledged to hire an "independent third party" for a valuation of AGF II's receivables but did not engage, or otherwise disclose the retention of, an investment banker to analyze the proposed transaction, *id.* ¶¶ 205-206.

### 3.  Signing the Exchange Offer

The Exchange Offer's opt-in period expired on December 22, 2020.  *Id.* ¶ 207.[2] "[B]ased upon the false and misleading information in the Offering documentation and the no-win situation that the Exchange Offer presented," Terri signed the Exchange Offer on December 3, 2020.  *Id.* ¶ 219.  However, Randy and Debra did not sign the Exchange Offer before the opt-in deadline.  *Id.* ¶ 208.

---

[2] While the Amended Complaint reflects this date as December 22, 2022, the correct date appears to be December 22, 2020 based on the context of the sentence.  Am. Compl. ¶ 207.

In pressing Randy and Debra to agree to the Exchange Offer, Johnson made additional false statements in writing. *See id.* ¶¶ 212-216. For example, Johnson blamed AGF II's liquidation on COVID-19, *id.* ¶ 212; assured Randy that, contrary to the Exchange Offer's terms, he could sell his common stock in Propellus at any time, *id.* ¶¶ 215-216; and attributed the "80% haircut" on AGF II's assets under the Exchange Offer to "the maximum tax benefit [that] a Member could receive under IRS rules," *id.* ¶ 210-211. Based on these statements, the false and misleading information in the Exchange Offer, and the "no-win situation" presented, Randy and Debra signed the offer on January 13, 2021. *Id.* ¶ 217.

Most relevantly for this case, the Exchange Offer states that:

> The AGF II Member and any of his/her/their agents, successors, and assigns, hereby releases acquits and forever absolutely discharges AGF II and the Company and the AGF II's past and present owners, management members, employees, . . . representatives, agents, attorneys, affiliated entities and persons, . . . from liabilities owed to the AGF II Member and any other obligations, . . . plus any and all actions, causes of action, claims, debts, liabilities, accounts, demands, damages, causes, . . . or any other thing whatsoever whether known or unknown, suspected or unsuspected, certain or speculative, accrued or unaccrued that the AGF II Member ever had or now have relating to or arising out of past agreements, contracts, obligations and relationships written or verbal with AGF II.

Notice at 12, 25, 38, 51 (the "Release"). In signing the Release, participants stated that:

> [H]e or she has access to adequate information regarding the terms of this Exchange Offer, the scope and effect of the provisions set forth herein and all other matter encompassed by this Exchange Offer, to make an informed and knowledgeable decision with regard to enter into the Exchange Offer. The AGF II Member further represents and warrants that he or she has not relied on the Company in deciding to enter into this Exchange Offer and has instead made his or her own independent analysis and decision to enter into this Exchange Offer.

*Id.*

### 4. Priority Redemption Agreements

Randy and Debra did not sign the Exchange Offer on behalf of the Langhamer Children's four UGMA accounts for which they were custodians. Am. Compl. ¶ 226. Their decision not to sign was based on Johnson's promises to prioritize payments from AGF II's liquidation to the Langhamer Children. *Id.* ¶ 227. Propellus memorialized those promises in several Redemption Priority Funding Agreements (the "Priority Agreements"), under which it agreed to pay and distribute to the Langhamer Children, on a pro-rata basis, 80% of all funds that Propellus collected from the liquidation. *Id.* ¶¶ 230, 233. In wire transfers that referenced "REDEMPTIONS FOR 4 UGMA ACCOUNTS," the Langhamer Children received $17,034.45 from AGF II on August 16, 2021, and another $7,804.22 on December 13, 2021. *Id.* ¶ 234. However, the Langhamer Children have not received any further redemption payments. *Id.* ¶ 235.

## II. Procedural History

On July 20, 2022, Plaintiffs filed their Complaint, which they amended on October 25, 2022. *See* ECF No. 37; Am. Compl. The Amended Complaint pleads fourteen causes of action. *See* Am. Compl. ¶¶ 246-368. In connection with Plaintiffs' AGF II investments, the Amended Complaint asserts two Exchange Act claims and four state common law claims: (i) Section 10(b) violations against AGF II and Johnson (Count I); (ii) Section 20(a) violations against Johnson as a "controlling person" of AGF II (Count II); (iii) fraudulent inducement against AGF II and Johnson (Count V); (iv) aiding and abetting fraud in the inducement against Johnson (Count VI); (v) breach of fiduciary duty against AGF Management and Johnson (Count IX); and (vi) breach of implied contract against AGF II, AGF Management, and Johnson (Count XIII). *See id.* ¶¶ 246-263, 281-297, 315-324, 346-356.

In connection with Plaintiffs' participation in the Exchange Offer, the Amended Complaint asserts a similar set of claims arising from the Exchange Act and state common law: (i) Section 10(b) violations against all Defendants (Count III); (ii) Section 20(a) violations against Johnson as a "controlling person" of AGF II and Propellus (Count IV); (iii) fraudulent inducement against all Defendants (Count VII); (iv) aiding and abetting fraud in the inducement against Johnson (Count VIII); (v) breach of fiduciary duty against AGF Management and Johnson (Count X); and (vi) breach of contract against Propellus, PFSI, and AGF II (Count XIV). *See id.* ¶¶ 264-280, 298-314, 325-334, 357-368. Plaintiffs also seek a declaratory judgment declaring both the Exchange Offer and the Priority Agreements unenforceable (Counts XI and XII). *See id.* ¶¶ 335-345.

Defendants answered the Amended Complaint on December 2, 2022. *See* ECF No. 66 ("Ans."). On December 27, 2022, Defendants moved to dismiss the Amended Complaint. *See generally* Br. Plaintiffs opposed the motion on January 31, 2023, *see* Opp., and Defendants filed their reply on February 21, 2023, *see* Reply.

## LEGAL STANDARD

As a preliminary matter, the Court notes that Defendants answered the Amended Complaint before they moved to dismiss it. *See* Ans.; Br. This motion is untimely because such a motion "must be made before pleading if a responsive pleading is allowed." Fed. R. Civ. P. ("Rule") 12(b). A Rule 12(b)(6) motion is untimely "where the movant 'previously filed an answer in this action.'" *Xiao Dong Fu v. Red Rose Nail Salon Inc.*, No. 15-cv-07465 (KPF), 2017 WL 985893, at *9 (S.D.N.Y. Mar. 13, 2017) (quoting *Niederland v. Chase*, No. 11-cv-06538 (RWS), 2012 WL 2402603, at *4 (S.D.N.Y. June 26, 2012)). Nevertheless, the Second Circuit has held that an untimely Rule 12(b)(6) motion may be "considered as a Rule 12(c) motion for judgment on the pleadings." *Patel v. Contemp. Classics of Beverly Hills*,

259 F.3d 123, 126-27 (2d Cir. 2001).  Therefore, the Court treats Defendants' untimely

motion to dismiss as a motion for judgment on the pleadings under Rule 12(c).

Under Rule 12(c), after the pleadings have closed, "but early enough not to delay

trial," a party may move for judgment on the pleadings.  *Wells Fargo Bank, N.A. v. Wrights

Mill Holdings, LLC*, 127 F. Supp. 3d 156, 167 (S.D.N.Y. 2015).  "A motion for judgment on

the pleadings is governed by 'the same standard' as a motion to dismiss under Rule 12(b)(6)."

*Id.* (quoting *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010)).  That is, the Court must

accept the non-movant's factual allegations as true and draw all inferences in favor of the non-

movant.  *Id.*

On a Rule 12(c) motion, "courts may consider all documents that qualify as part of the

non-movant's 'pleading,' including (1) the complaint or answer, (2) documents attached to the

pleading, (3) documents incorporated by reference in or integral to the pleading, and (4)

matters of which the court may take judicial notice."  *Lively v. WAFRA Inv. Advisory Grp.,

Inc.*, 6 F.4th 293, 306 (2d Cir. 2021) (emphasis omitted); *see L-7 Designs, Inc. v. Old Navy,

LLC*, 647 F.3d 419, 422 (2d Cir. 2011).  However, if a pleading is contradicted by a document

either attached to that pleading or otherwise "made a part thereof, the document controls and

the court need not accept as true the allegations of the [pleading]."  *Wrights Mill Holdings*,

127 F. Supp. 3d at 168 (alteration in original) (quoting *Sazerac Co. v. Falk*, 861 F. Supp. 253,

257 (S.D.N.Y. 1994)).  Because of this, "a motion for judgment on the pleadings 'can be

particularly appropriate in breach of contract cases involving legal interpretations of the

obligations of the parties.'"  *Id.* (quoting *VoiceAge Corp. v. RealNetworks, Inc.*, 926 F. Supp.

2d 524, 529 (S.D.N.Y. 2013)).

## DISCUSSION

Defendants move to dismiss the Amended Complaint on three grounds. First, Defendants argue that the Exchange Offer released Defendants from all claims raised in the Amended Complaint.[3] *See* Br. at 5-8. Second, Defendants argue that Plaintiffs' claims as to their AGF II investments are time barred under both the Exchange Act and New York law. *See id.* at 15-20. Finally, Defendants argue that the Amended Complaint fails to meet the pleading standard of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(1). *See id.* at 21-23. Plaintiffs oppose each of these arguments. *See* Opp. The Court will address these arguments in turn.

## I. The Release

Defendants argue that the Exchange Offer amounts to a private settlement agreement, in which the parties agreed to "settle any and all claims" that Plaintiffs "could allege against Defendants arising out of [their] past agreements, contracts, obligations and relationships." Br. at 6-7. Plaintiffs respond that the release is unenforceable because it lacked consideration, contains overbroad language, and was induced by fraud. Opp. at 8-16.

Assuming, without deciding, that the Release was supported by consideration and does not contain overbroad language, the Court finds that Plaintiffs have sufficiently alleged facts that could support their claim of fraudulent inducement, which if proven, would invalidate the Release. Under New York law, "[g]enerally, a valid release constitutes a complete bar to an action on a claim which is the subject of the release." *Collins-Genova v. Louros*, 167

---

[3] Defendants also argue that Plaintiffs' claims of fraud, duress, or undue influence are insufficient to void the Exchange Offer's Release. *See* Br. at 8-15. Because Defendants advance this argument as another reason for why the Release is valid, and not as an independent rebuttal against Plaintiff's claims in the absence of a binding release, the Court considers it during its review of the Release. *See infra* Discussion § I.

N.Y.S.3d 100, 102 (2d Dep't 2022) (quoting *Centro Empresarial Cempresa S.A. v. América Móvil, S.A.B. de C.V.*, 17 N.Y.3d 269, 276 (2011) ("*Centro Empresarial*")); *see McCormack v. IBM*, 145 F. Supp. 3d 258, 268 (S.D.N.Y. 2015) (stating the standard for evaluating a general liability release under New York law).  However, "duress, illegality, fraud or mutual mistake" can invalidate a release.  *CyCan, LLC v. Palladian Health, LLC*, 190 N.Y.S.3d 772, 775 (4th Dep't 2023) (quoting *Centro Empresarial*, 17 N.Y.3d at 276).

A party seeking to invalidate a release due to fraudulent inducement must "establish the basic elements of fraud."  *Id.* at 776 (quoting *Centro Empresarial*, 17 N.Y.3d at 276).  In other words, the party must show "a misrepresentation or a material omission of fact which was false and known to be false by [the party making it], made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury."  *Id.* (alteration in original) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421 (1996)); s*ee Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 580 (2d Cir. 2005) (outlining the same elements for fraudulent inducement under New York law).  A party can challenge a release as fraudulently induced "only if it can identify a separate fraud from the subject of the release."  *Centro Empresarial*, 17 N.Y.3d at 276 (citing *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 527-28 (2d Cir. 1985)).

For New York common law fraud claims, whether a plaintiff's reliance is "'reasonable' depends on 'the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them.'"  *Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*, 902 F. Supp. 2d 476, 496 (S.D.N.Y. 2012) (quoting *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343

F.3d 189, 195 (2d Cir. 2003)).  Usually, "dismissals for failure to allege reasonable reliance are heavily disfavored."  *Wild Bunch, SA v. Vendian Ent., LLC*, 256 F. Supp. 3d 497, 507 (S.D.N.Y. 2017); *see Bayerische Landesbank, N.Y. Branch v. Barclays Cap., Inc.*, 902 F. Supp. 2d 471, 474 (S.D.N.Y. 2012) ("Whether or not reliance on alleged misrepresentations is reasonable in the context of a particular case is intensely fact-specific and generally considered inappropriate for determination on a motion to dismiss.").  The Second Circuit has explained that "the reasonableness of a plaintiff's reliance is a 'nettlesome' and 'fact-intensive' question, which we, like our Circuit's many district courts, will not lightly dispose of at the motion-to-dismiss stage."  *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 186 n.19 (2d Cir. 2015) (internal citations omitted) (quoting *Schlaifer Nance & Co. v. Est. of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997)).

By alleging that Defendants made additional misrepresentations to induce Plaintiffs to sign the Release, Plaintiffs have identified a "separate fraud" on top of any fraud claims related to their AGF II investments.  *Centro Empresarial*, 17 N.Y.3d at 276.  The facts alleged could plausibly establish that their reliance on those alleged misrepresentations, secured through repeated assurances made in the monthly update, the Exchange Offer itself, and subsequent communications, was reasonable.  *See Fed. Hous. Fin. Agency*, 902 F. Supp. 2d at 496 (finding that, "even in the face of knowledge that many of the originators supplying loans . . . engaged in dubious underwriting practices," plaintiffs could rely on defendants' assertion that the loans "complied with the guidelines set out in the offering materials" (citation omitted)); *DDJ Mgmt., LLC v. Rhone Grp. L.L.C.*, 15 N.Y.3d 147, 153 (2010) (finding reasonable reliance where defendants represented in a loan agreement that their financial statements were accurate).  "A jury may ultimately conclude that [Plaintiffs] should

have known better than to rely on [Defendants'] representations" as to the terms of the Exchange Offer, but such a finding as a matter of law on this motion for judgment on the pleadings is not appropriate. *Fed. Hous. Fin. Agency*, 902 F. Supp. 2d at 498.

Defendants argue that Plaintiffs cannot claim reasonable reliance where the alleged misrepresentations conflict with the statement in the Release that Plaintiffs had "access to adequate information." Br. at 13; Reply at 9. However, each of the cases cited by Defendants concerns instances in which defendants made oral or otherwise vague representations that plainly conflicted with written documents. *See Passelaigue v. Getty Images (US), Inc.*, No. 16-cv-01362 (VSB), 2018 WL 1156011, at *4 (S.D.N.Y. Mar. 1, 2018) (evaluating a conflict between an oral promise and a written release); *Jackson v. Broad. Music, Inc.*, No. 04-cv-05948 (TPG), 2006 WL 250524, at *9 (S.D.N.Y. Feb. 1, 2006) (noting allegations that the defendant misrepresented the purpose and effect of written documents), *aff'd*, No. 06-cv-2283, 2007 WL 2914516, at *1 (2d Cir. Oct. 5, 2007); *Wash. Cap. Ventures, LLC v. Dynamicsoft, Inc.*, 373 F. Supp. 2d 360, 366 (S.D.N.Y. 2005) (finding no reasonable reliance where written document that the plaintiff failed to read "plainly contradicted" the alleged misrepresentation); *Morby v. Di Sienna Assocs. LPA*, 737 N.Y.S.2d 678, 680 (3d Dep't 2002) (holding that the "plaintiff cannot now avoid his obligations under a release he did not read merely by asserting that he 'thought' it was something else"); *Maines Paper & Good Serv. Inc. v. Adel*, 681 N.Y.S.2d 390, 391 (3rd Dep't 1998) (finding that the plaintiff could not have justifiably relied on oral misrepresentations where he failed to read or have someone else read and explain an agreement that was otherwise clear); *Dunkin' Donuts of Am., Inc. v. Liberatore*, 526 N.Y.S.2d 141, 143 (2d Dep't 1998) (same).

In contrast to those cases, Plaintiffs attribute their decision to participate in the Exchange Offer to false and misleading statements not only in the offer itself, *see* Am. Compl. ¶¶ 186, 189, 194-200, 205-206, but also in the monthly written update issued before the Exchange Offer was circulated, *see id.* ¶¶ 176-185 (describing the monthly update). Plaintiffs Randy and Debra Langhamer also allege that they relied on additional written statements made by Johnson after the Exchange Offer was circulated. *See id.* ¶¶ 210-216.[4]

Defendants' point that Plaintiffs are sophisticated parties who therefore cannot reasonably rely on the alleged misrepresentations is similarly unavailing. *See* Br. at 12-13. As Defendants note, sophisticated parties are held to a "higher standard" in assessing whether reliance on allegedly fraudulent misrepresentations is justifiable. *JP Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 406 (S.D.N.Y. 2004); *see* Br. at 12. Where "the facts represented are not matters peculiarly within the [defendant's] knowledge, and the [plaintiff] has the means available to him of knowing, by the exercise of ordinary intelligence, the truth . . . of the representation, he must make use of those means" before claiming reasonable reliance. *DDJ Mgmt., LLC*, 15 N.Y.3d at 154 (quoting *Schumaker v. Mather*, 133 N.Y. 590, 596 (1892)). Even assuming that Plaintiffs were sophisticated parties with respect to the Exchange Offer, the facts alleged in this case are sufficient to support a plausible claim of reasonable reliance at the pleading stage. Many of the facts allegedly misrepresented were known only to Defendants. *See* Am. Compl. ¶ 304. Plaintiffs could hardly have discovered

---

[4] Defendants also suggest that the language of the Release is broad enough to release them from all unknown fraud claims, including even Plaintiffs' claim of fraudulent inducement. *See* Reply at 7 (citing *Consorcio Prodipe, S.A. de C.V. v. Vinci, S.A.*, 544 F. Supp. 2d 178, 192 (S.D.N.Y. 2008)). That argument does not hold, however, where Plaintiffs stake their fraudulent inducement claim on alleged communications made as to the Exchange Offer and which are not otherwise related to the underlying fraud alleged for the AGF II investments.

on their own, for example, that the Peruvian Mining Companies had failed to repay their outstanding loans to AGF long before the onset of the pandemic, *id.* ¶ 114, or that the "chairman" of AGF II's "largest receivable" was a member of AGF II's Board of Managers, *id.* ¶¶ 114, 177, 182.  Even accepting Defendants' position that some of Plaintiffs' alleged omissions – like the failure to disclose the SEC enforcement action and the bar on Allen's participation in any offering of a penny stock – were "matter[s] of public record," Reply at 10, Plaintiffs have alleged other misrepresentations that adequately plead reasonable reliance, *see* Am. Compl. ¶¶ 175-197.

In any case, Plaintiffs Randy and Debra undertook efforts to protect themselves, further justifying their claims of reasonable reliance.  In *DDJ Management, LLC*, the plaintiff companies alleged that they had relied on false and misleading financial statements to issue loans to the defendant entities.  15 N.Y.3d at 151.  The New York Court of Appeals held that the plaintiffs had alleged justifiable reliance, noting that while "there were hints from which [the] plaintiffs might have been put on their guard in this transaction," they had "made a significant effort to protect themselves" by "obtain[ing] representations and warranties."  *Id.* at 156.  Here, Johnson assured Randy and Debra Langhamer that AGF II's liquidation was due to COVID-19 and that, contrary to the Exchange Offer's terms, he could sell his Propellus shares at any time.  Am. Compl. ¶¶ 212, 215-216.  Randy and Debra took "reasonable steps to protect [themselves] against deception" by extracting written assurances from Defendants. *DDJ*, 15 N.Y.3d at 154; *see id.* ("In particular, where a plaintiff has gone to the trouble to insist on a written representation that certain facts are true, it will often be justified in accepting that representation rather than making its own inquiry.").

Defendants also argue that Randy's allegations of fraud contradict the Exchange Offer and Randy's own statements.  Br. at 9-11.  Defendants claim that Randy could not have been unduly pressured to sign the Exchange Offer because he decided not to sign the Exchange Offer on behalf of the Langhamer Children and received several extensions to consider his options.  *See id.* at 9-10.  But Defendants ignore Plaintiffs' allegation that they decided not to sign the Exchange Offer because Johnson had promised to prioritize payments from AGF II's liquidation to the Langhamer Children's accounts.  Am. Compl. ¶ 227.  Defendants also mischaracterize Plaintiffs' allegations as to why they were granted extensions: they were not granted, as Defendants assert, for Plaintiffs to consult their financial advisor but, according to Plaintiffs, as part of an "'attorney is waiting' ploy to pressure the Langhamers to sign."  *Id.* ¶ 214.

Finally, Defendants claim that Terri failed to adequately plead fraudulent inducement in alleging that she signed the Exchange Offer only "based upon false and misleading information in the Offering documentation."  *Id.* ¶ 219; *see* Br. at 11-12.  By referencing the false and misleading information in the Exchange Offer documentation and that "no win situation that the Exchange Offer presented," this paragraph incorporates the previous detailed paragraphs in the Amended Complaint alleging the false and misleading statements in the monthly update and the Exchange Offer.  *See* Am. Compl. ¶¶ 175-206.  Contrary to Defendants' argument that the allegation lacks specificity, those allegations plainly detail allegedly fraudulent statements and identify the speaker of those statements.

Therefore, the Court finds that, at least at the pleading stage, the Release does not bar Plaintiffs' claims as a matter of law because there are issues of fact regarding whether Plaintiffs were fraudulently induced to sign the Release.

**II. Statute of Limitations**

Defendants also argue that Plaintiff's pre-Exchange Offer claims are untimely. *See* Br. at 15-20. A district court may consider timeliness arguments on a motion to dismiss (or motion for judgment on the pleadings) when the circumstances are "sufficiently clear on the face of the complaint and related documents as to make the time-bar ruling appropriate." *LC Cap. Partners, LP v. Frontier Ins. Grp., Inc.*, 318 F.3d 148, 157 (2d Cir. 2003).

Exchange Act claims sounding in fraud must be filed within the earlier of five years from the alleged violation or two years "after the discovery of the facts constituting the violation." 28 U.S.C. § 1658(b). For purposes of assessing timeliness under the five-year statute of repose, Section 10(b) violations occur "on the dates the parties have committed themselves to complete the purchase or sale of transaction." *Kaplan v. S.A.C. Cap. Advisors, L.P.*, 40 F. Supp. 3d 332, 343 (S.D.N.Y. 2014) (quoting *Arco Cap. Corp., Ltd. v. Deutsche Bank AG*, 949 F. Supp. 2d 532, 544 (S.D.N.Y. 2013)); *see P. Stolz Fam. P'ship L.P. v. Daum*, 355 F.3d 92, 104 (2d Cir. 2004) (interpreting the five-year limit in § 1658(b)(2) as a "statute of repose").

Under New York law, claims based on fraud must be filed within "the greater of six years from the date the cause of action accrued or two years from the time the plaintiff . . . discovered the fraud, or could with reasonable diligence have discovered it." N.Y. C.P.L.R. § 213(8). These claims accrue "when the claim becomes enforceable, i.e., when all elements of the tort can be truthfully alleged in a complaint." *Bai v. Tegs Mgmt., LLC*, No. 22-0681, 2023 WL 6458542, at *1 (2d Cir. Oct. 4, 2023) (cleaned up) (quoting *Meimaris v. Royce*, No. 19-3339, 2021 WL 5170725, at *3 (2d Cir. Nov. 8, 2021)); *see Loreley Fin. (Jersey) No. 3 Ltd.*, 797 F.3d at 170 (listing the elements of fraud under New York law as "(1) a material misrepresentation or omission of a fact, (2) knowledge of that fact's falsity, (3) an intent to

induce reliance, (4) justifiable reliance by the plaintiff, and (5) damages"). Although "New York law does not provide a single statute of limitations for breach of fiduciary duty claims," Defendants concede that courts have applied a six-year limitations period under N.Y. C.P.L.R. § 213(8) where "an allegation of fraud is essential" to the claim. *IDT Corp. v Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 139 (2009); *see* Br. at 20.

### A. Accrual

### 1. Federal Claims

To determine which of Defendants' statements are relevant to Plaintiffs' Exchange Act claims and whether any or all these claims are time barred, the Court considers when Plaintiffs "purchased" the AGF II Units. Defendants focus primarily on Plaintiffs' initial purchases, made by Randy and Debra in 2011, the Langhamer Children in 2015, and Terri in 2016. *See* Br. at 16. However, Plaintiffs subsequently rolled over their investments through the Rollover Program. Am. Compl. ¶¶ 30, 37, 79; *see id.* ¶ 86.

Under the Exchange Act, a purchase occurs at "the time when the parties to the transaction are committed to one another." *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 891 (2d Cir. 1972). "Before changes in the rights of a security holder can qualify as the 'purchase' of a new security under Section 10(b) and Rule 10b-5, there must be such significant change in the nature of the investment or in the investment risks as to amount to a new investment." *Abrahamson v. Fleschner*, 568 F.2d 862, 868 (2d Cir. 1977), *abrogated on other grounds by Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11 (1979).

In *Pollack v. Laidlaw Holdings, Inc.*, a court in this District considered whether a new "purchase" occurred that could give rise to Exchange Act liability each time a promissory note was renewed or extended upon maturity. No. 90-cv-05788 (DLC), 1995 WL 261518, at *7 (S.D.N.Y. May 3, 1995). There, the court concluded that a new purchase occurred each

time a mortgage was renewed, extended, or rolled over because the plaintiffs had alleged a belief "that they could liquidate their investment or, where appropriate, renew or extend their investment at the time of the maturity date." *Id.* at *8. As with the notes renewed in *Pollack*, renewing the AGF II Units through the Rollover Program "constitute[d] a significant change in the investment risks." *Id.* At the point just prior to the end of the lock-up period, the risk of Plaintiffs' AGF II investment turned solely on AGF II's ability to pay back the principal and accrued interest. After rolling over their investments for another lock-up period, Plaintiffs' risk now depended on AGF II's financial solvency over the next two years. These rollovers amounted to a significant enough change in investment risk for the Court to deem each of them a "purchase" under the Exchange Act. *See Abrahamson*, 568 F.2d at 868. Accordingly, the Court finds that each Plaintiff in this case made at least one purchase within five years of the date that Plaintiffs filed their original Complaint.

### 2. State Claims

As a preliminary matter, the Court deems timely Plaintiffs' breach of implied contract claim. Defendants concede that their alleged failure to honor Plaintiffs' redemption requests occurred in 2018 and 2019, within six years of when Plaintiffs filed their initial Complaint in June 2022. *See* Br. at 19; N.Y. C.P.L.R. § 213(2) (setting New York's statute of limitations for breach-of-contract claims at six years).

Plaintiffs argue, and Defendants do not dispute, that their other state claims are subject to equitable tolling under the "continuing violation" doctrine. *See* Opp. at 20, 23-24. The doctrine "is usually employed where there is a series of continuing wrongs and serves to toll the running of a period of limitations to the date of the commission of the last wrongful act." *Henry v. Bank of Am.*, 48 N.Y.S.3d 67, 70 (1st Dep't 2017) (internal citation omitted). Under this rule, Plaintiffs claim, their pre-Exchange Offer claims accrued only after Defendants' last

misrepresentation, made shortly before Plaintiffs last decided to roll over their AGF II

investments.  *See* Br. at 20; Am. Compl. ¶¶ 98-112 (citing misleading account statements),

¶¶ 153-162 (empty promises of new investor money), ¶¶ 170-172 (repeated assurances that

AGF's Advances were "triple secured and collateralized"), ¶¶ 236-244 (AGF II's incomplete

tax returns).

However, "New York courts have repeatedly refused to apply the continuing violation

doctrine to common law fraud-based claims which, like Plaintiffs' claims, accrue at the time

of purchase."  *Ramiro Aviles v. S & P Glob., Inc.*, 380 F. Supp. 3d 221, 289 (S.D.N.Y. 2019)

(quoting *Cupersmith v. Piaker & Lyons P.C.*, No. 14-cv-01303, 2016 WL 5394712, at *11

(N.D.N.Y. Sept. 27, 2016) (collecting cases)).  Here, Plaintiffs do not deny that their pre-

Exchange Offer state claims of fraudulent inducement first accrued at the time of their initial

AGF II investments.[5]  *See id.* at 275 ("[A] fraud claim accrues . . . when a plaintiff takes

detrimental action in reliance on a fraudulent statement, and not at the time the statement is

made."); *see Bai*, 2023 WL 6458542, at *1.  Having accrued at the moment of the initial

purchase of AGF II Units, Plaintiffs' fraudulent inducement claims are ill-suited for the

continuing violation doctrine.  *See Cupersmith*, 2016 WL 5394712, at *11 (collecting cases

where New York courts have declined to apply the doctrine to common law fraud-based

claims).  The one case on which Plaintiffs rely to support their continuing violation doctrine

---

[5] Defendants focus most of their statute-of-limitations arguments on the timing of particular
alleged misrepresentations and omissions.  *See* Br. at 17-19.  The Court acknowledges that at
least one other court in this District has found that a fraud claim under New York law accrues
"at the time the defendant makes a knowingly false statement of fact with the intent to induce
reliance on that statement."  *Kwan v. Schlein*, 441 F. Supp. 2d 491, 504 (S.D.N.Y. 2006).  But
because "justifiable reliance" is an element of a fraud claim, *Lerner v. Fleet Bank, N.A.*, 459
F.3d 273, 291 (2d Cir. 2006) (quoting *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 165 (1st Dep't
2003)), a claim can hardly accrue before such reliance – namely, investing in AGF II Units or
rolling over existing investments – has occurred.

for their fraudulent inducement claims is unpersuasive: *State v. 7040 Colonial Road*

*Associates Co.* applied the doctrine to an action brought under New York's Martin Act and

stated concerns not applicable to common law fraud claims.  *See* 671 N.Y.S.2d 938, 944 (Sup.

Ct. 1998).  Therefore, the Court finds that Plaintiffs' fraudulent inducement claims accrued at

the time of their initial purchases of AGF II Units.  However, as explained below, these claims

are still timely under New York's discovery rule.  *See infra* Discussion § 2.B; N.Y. C.P.L.R.

§ 213(8).

That said, the continuing violation doctrine does apply to Plaintiffs' breach of

fiduciary duty claim.  In that context, New York courts have more routinely tolled claims for

breaches of a continuing duty, even if the first breach occurred outside the limitations period.

*See Palmeri v. Willkie Farr & Gallagher LLP*, 69 N.Y.S.3d 267, 271 (1st Dep't 2017)

(applying doctrine to toll breach of fiduciary claim past the date of the termination of a

professional relationship between the parties until later instances when defendant "acted in a

manner directly adverse to [the plaintiff's] interests"); *Ganzi v. Ganzi*, 123 N.Y.S.3d 574, 576

(1st Dep't 2020) (tolling breach of fiduciary duty claim where each new license agreement

was a "new, overt act"); *Yin Shin Leung Charitable Found. v. Seng*, 113 N.Y.S.3d 46, 48 (1st

Dep't 2019) (holding that the continuing wrong doctrine applied to the alleged unauthorized

use of certain corporate funds because "each [unauthorized use] required a separate exercise

of judgment and authority").

Here, Plaintiffs' rollover investments amount to new claims of the breach of fiduciary

duty, arising "out of a new set of facts that forms part of a series with the original wrong."

*CWCapital Cobalt VR Ltd. v. CWCapital Invs. LLC*, 145 N.Y.S.3d 61, 66 (1st Dep't 2021).

Each time that Plaintiffs decided to roll over their AGF II investments represented a "new,

overt act" for which Defendants renewed a set of misrepresentations and omissions. *Ganzi*, 123 N.Y.S.3d at 576. Therefore, the statute of limitation for Plaintiffs' breach of fiduciary duty claim is keyed to the date of the final breach when Plaintiffs ended their fiduciary relationship with AGF Management by signing the Exchange Offer. *See Lebedev v. Blavatnik*, 38 N.Y.S.3d 159, 162 (1st Dep't 2016) (noting that a breach of fiduciary duty claim "accrues where the fiduciary openly repudiates his or her obligation – i.e., once damages are sustained"); *Westchester Religious Inst. v. Kamerman*, 691 N.Y.S.2d 502, 503 (1st Dep't 1999) (noting that the statutory period for breach of a fiduciary relationship does not run "until the fiduciary has openly repudiated his or her obligation or the relationship has been otherwise terminated"). The breach of fiduciary duty claim is therefore timely.

### B. Discovery

The discovery rule does not alter the Court's conclusion on the timeliness of Plaintiffs' Exchange Act claims. In that context, discovery "is stricter than inquiry notice." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 94 (2d Cir. 2018). A fact is not "deemed 'discovered' until a reasonably diligent plaintiff would have sufficient information about that fact to adequately plead it in a complaint." *City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011); *see Merck & Co. v. Reynolds*, 559 U.S. 633, 637 (2010) (noting that the Exchange Act's two-year discovery period starts when "a reasonably diligent plaintiff would have discovered . . . the facts constituting the violation . . . includ[ing] the fact of scienter" (quotation marks omitted)). Defendants bear the burden of proving that the limitations period has run. *See Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 122 (2d Cir. 2017).

Defendants have not shown that a reasonable investor in Plaintiffs' shoes would have discovered sufficient information to plead a plausible claim for relief by June 29, 2020, two

years before the filing of Plaintiffs' initial Complaint.  Defendants note that Johnson made

misrepresentations in various PPMs, but do not explain why Plaintiffs could have alleged an

Exchange Act violation at that time.  *See* Br. at 17.  They refer to Plaintiffs' allegation that no

audit of AGF II's financials occurred until 2014, yet fail to argue why Plaintiffs' failure to

receive timely audited statements would by itself enable Plaintiffs to allege all elements of a

fraud claim.  *Id.* at 18.  Defendants suggest that Plaintiffs knew of the alleged fraud when the

SEC filed its enforcement action in February 2016, but then emphasize that these allegations

"were never proven in court."  *Id.* at 19; *see Merck*, 559 U.S. at 654 (rejecting the argument

that the filing of four prior complaints and an FDA warning letter should have revealed

scienter); *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 258 F.

Supp. 3d 1037, 1045 n.4 (N.D. Cal. 2017) (noting the "well settled" rule that "allegations

from other complaints or documents, which are unproved and are contested, may not be used

to establish facts to demonstrate scienter" (internal quotations omitted)).  Finally, Defendants

argue that they allegedly failed to honor Plaintiffs' redemption requests in 2018 and 2019.  Br.

at 19.  However, they do not otherwise contest Plaintiffs' allegation that Plaintiffs did not

have sufficient facts to allege fraud in connection with their redemption requests until the

Exchange Offer revealed in November 2020 that Defendants would liquidate investors' AGF

II Units without offering the option to redeem them.  Am. Compl. ¶ 206.

  For similar reasons, the Court concludes that Plaintiffs have adequately pleaded that

they neither discovered the fraud, nor with reasonable diligence could have discovered the

fraud, until within two years of filing their original complaint.[6]  For common law fraud claims

---

[6] Because the Court has deemed timely the breach of implied contract and breach of fiduciary duty claims, it declines to analyze these claims under the discovery rule.  *See* N.Y. C.P.L.R. § 213(8) (requiring fraud claims to be filed within "*the greater*" of six years after accrual or

in New York, the two-year discovery period begins to run when a plaintiff has actual or inquiry notice of his injury. *See Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 361 (2d Cir. 2013). Discovery is normally imputed when a plaintiff is "possessed of knowledge of facts from which [the fraud] could be reasonably inferred." *Sargiss v. Magarelli*, 12 N.Y.3d 527, 532 (2009) (alteration in original) (quoting *Erbe v. Lincoln Rochester Tr. Co.*, 3 N.Y.2d 321, 326 (1957)). "Generally, knowledge of the fraudulent act is required and mere suspicion will not constitute a sufficient substitute." *Id.* (quoting *Erbe*, 3 N.Y.2d at 326). Drawing all inferences in favor of Plaintiffs, *Wells Fargo Bank, N.A.*, 127 F. Supp. 3d at 167, the Court cannot conclude from Plaintiffs' allegations that, prior to the Exchange Offer, they knew sufficient facts to make a reasonable inference of fraud, *Sargiss*, 12 N.Y.3d at 532.

## III. Pleading Requirements

Finally, Defendants argue that the Amended Complaint fails to meet the "heightened" pleading standard under Rule 9(b) and the PSLRA. *See* Br. at 21-23. The Court disagrees. While Rule 8 requires only "a short and plain statement" of the plaintiff's claim, Rule 9(b) requires that "[i]n alleging fraud . . . , a party must state with particularity the circumstances constituting fraud." *Loreley Fin. (Jersey) No. 3 Ltd.*, 797 F.3d at 171 (quoting Rule 9(b)). While "[m]alice, intent, knowledge, and" other conditions of the defendant's mind "may be averred generally," *Lerner*, 459 F.3d at 290 (quoting Fed. R. Civ. P. 9(b)), the plaintiff "must allege facts that give rise to a strong inference of fraudulent intent," *id.* (internal citation omitted). To satisfy Rule 9(b), "the plaintiff must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *First Hill Partners, LLC v.*

---

"two years from the time the plaintiff . . . discovered the fraud, or could with reasonable diligence have discovered it" (emphasis added)); *id.* § 213(2).

*BlueCrest Cap. Mgmt. Ltd.*, 52 F. Supp. 3d 625, 637 (S.D.N.Y. 2014) (internal citation omitted); *see Sinay v. CNOOC Ltd.*, 554 F. App'x 40, 42 (2d Cir. 2014) (noting that the PSLRA requires the complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" (quoting 15 U.S.C. § 78u–4(b)(2))).

After spending significant time detailing the legal standard to be applied, Defendants summarily assert in a single paragraph that the Amended Complaint is insufficiently pled for failing to "allege[] when or how the statements were made." Br. at 23. However, Defendants fail to point to any paragraph in the Amended Complaint that fails to satisfy Rule 9(b) and the PSLRA. To the contrary, the Court's review of the Amended Complaint (as summarized in the Background section of this opinion) confirms that most, if not all, of Plaintiffs' allegations regarding Defendants' documents and communications claimed to be false and misleading include details of when and how they were made.

## CONCLUSION

For the foregoing reasons, the Court DENIES Defendants' motion to dismiss the Amended Complaint. IT IS HEREBY ORDERED that the parties shall meet with the Court for an initial pre-trial conference on **November 1, 2023 at 10:00 a.m.** in Courtroom 20B of the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, New York, 10007. Per the Court's Individual Rules of Practice in Civil Cases, the parties shall file by **October 25, 2023** a proposed Civil Case Management Plan and Scheduling Order and a joint letter describing the case, any contemplated motions, and the prospect for settlement.

The Clerk of Court is respectfully directed to terminate the motion at ECF No. 68.

Dated: October 12, 2023
       New York, New York

SO ORDERED.

*Jennifer Rochon*

JENNIFER L. ROCHON
United States District Judge